[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The parties to this marital dissolution were married on October 15, 1956 in Hartford, Connecticut. Both have resided in the State for more than a year prior to the commencement of this action. They have no children in common.
Both parties are in the evening of their lives. The plaintiff, who is eighty seven years old, was previously widowed. At the time of her marriage to the defendant, she had two children from her first marriage who are now middle aged; adults. The defendant, who is ninety-one years old, was previously divorced. From this union, he had three children, all of whom are now adults.
The plaintiff resides in the former marital residence on Golf Road in West Hartford. Since early 1997, the defendant has been a resident of the Hebrew Home and Hospital in West Hartford. Because of the defendant's infirmity, his daughter, Elizabeth Levine, was appointed his guardian ad litem in this action. The plaintiff seeks a marital dissolution and an equitable division of the parties' estates; the defendant seeks periodic alimony, counsel fees, and lump sum alimony.
On October 11, 1956, four days before their marriage, the parties executed an antenuptial agreement. The court finds credible the plaintiff's testimony that the notion of entering CT Page 5704 into such an agreement came from Mr. Levine. The court credits Mrs. Levine's testimony that Mr. Levine presented a draft agreement to her with the suggestion that she take it to her lawyer. Thereafter, the plaintiff had the agreement reviewed and retyped by her lawyer, and it was then signed by both parties. At the time, the defendant was a practicing attorney. His signature was witnessed by his then partner. Mrs. Levine testified credibly that while neither she nor Mr. Levine made any formal financial disclosure to one another at the time, they had discussed their respective assets, and each had a general understanding of the other's financial situation.
Though the terms of the agreement are not binding on the court in this marital dissolution context, its contents illuminate the parties' intentions. In pertinent part, the agreement contemplated the parties' upcoming marriage, and it noted that each party had children from a former marriage. Plaintiff's Exhibit 4, Antenuptial agreement. The parties expressed their intention to, ". . . waive, renounce, relinquish, discharge and release all interest, right and claim in all renounce, relinquish, discharge and release all interest, right and claim in all property of the other, whether such interest, right and claim shall arise as dower, curtesy, statutory succession, statutory distribution in intestacy, right of election to take against the last will and testament, rights of surviving spouse, surviving widow or widower of the other, including statutory allowance to surviving widow, widower or dependent." Id. The agreement further stated, " . . . It being expressly agreed that this waiver, renouncement, relinquishment, discharge and release shall apply to and include without limitation all property now owned by each of the parties and all property which each of them shall acquire from any source whatever after the execution of this agreement, so that said marriage shall not in any way change their existing legal rights or the existing legal rights of their children and heirs in the property of each of them, and that the legal status of the property of each of them, now owned and/or hereinafter acquired and the right of disposition thereof by will or otherwise, shall remain as though said marriage had never been entered into." Id.
Additionally, the agreement provided: "Each party hereby waives, renounces, relinquishes, discharges and releases unto the other and unto the heirs, executors, administrators, legal representatives and assignees of the other forever, all interests, rights and claims as more fully mentioned and set CT Page 5705 forth in the preceding paragraph hereof numbered 4 in and to all the property of every kind and nature of the other, whether the same be presently owned or shall be acquired by either party subsequent to the execution of this agreement, and waives, renounces, relinquishes, discharges and releases any and all interests, rights and claims which either of them shall acquire by reason of the marriage to share in the estate of the other upon the latter's death." Id. Of additional relevance to the court is the provision that, " . . . Notwithstanding anything herein contained, this agreement shall not apply to property owned by the parties jointly with right of survivorship. " Id.
The agreement did not address the rights of the parties in the event of a marital dissolution. At the time, such an agreement would not have been enforceable if intended to facilitate a divorce, but it may not have violated public policy if it's sole purpose were to fix each party's rights to the other's estate upon death. cf. Schibi v. Schibi, 136 Conn. 196
(1949); Sacksell v. Barrett, 132 Conn. 139 (1945); Cowles v.Cowles, 74 Conn. 24 (1901).
Though the agreement is not a bar to the defendant's claims, it provides insight into the parties' relationship, and a basis for understanding their financial separateness during the marriage. Around the time of the marriage, either shortly before or soon thereafter, the plaintiff purchased the Golf Road residence in her own name. She testified credibly that her father gave her the sum of twenty-three thousand ($23,000) dollars toward a down payment, estimating that the defendant could afford to pay a mortgage of twenty-five thousand ($25,000) dollars from his earnings as an attorney. From this evidence, the court concludes that the purchase price of the property was approximately forty-eight thousand ($48,000) dollars. Title to this property was never put in joint names. It has remained solely in the plaintiff's name.
Nor were any other assets ever owned jointly by the parties except for a household checking account. Though the parties each accumulated assets during the marriage, they keep their finances separate from one another. They did not consult with each other concerning investments. They made no periodic disclosures to one another concerning the status or amounts of their separate estates. Consistent with the spirit of their antenuptial agreement, each made separate estate plans excluding the other from his and her estate. Perhaps emblematic of their personal CT Page 5706 relationship, each executed wills without even informing the other. On February 21, 1994, the defendant executed a will making no provision for the plaintiff except for ownership of automobiles and personal furnishings, stating, " . . . I make no further provision for my wife, Lisbeth S. Levine, for the reason that we entered into a pre-nuptial agreement on October 11, 1956 in which each one of us waived and renounced any interest which he or she may have in the Estate of the other." Plaintiff's Exhibit 11, Defendant's Last Will and Testament. Similarly, in the plaintiff's will, dated July 19, 1979, she stated, " . . . I declare that I am married to I. Oscar Levine. I had deliberately made no provision in my Will for my beloved husband inasmuch as he have entered into a pre-nuptial agreement whereby each of us has relinquished all rights to the other's estate." Plaintiff's Exhibit 9, Plaintiff's Last Will and Testament.
During the course of the parties' marriage, the plaintiff and the defendant shared one common checking account for purposes of paying household expenses. While both parties contributed to this account, the plaintiff acknowledged at trial that the defendant's contributions toward household expenses were substantially greater than hers. The plaintiff's deposits to this account were from passive income she received as a result of her investment in her birth family's business. The defendant's contributions flowed from his earnings as an attorney, and, in latter years, from his receipt of Social Security.
At present, the defendant has various liquidities, valued at approximately two hundred and twenty-three thousand ($223,000) dollars. While there was no direct evidence concerning the root of these assets, it is a reasonable inference from the testimony that they were accumulated by the defendant during the course of the marriage from the fruits of his legal practice.
The plaintiff has liquidities with a principal value of approximately six hundred and eighteen thousand ($618,000) dollars. Although these assets have been placed in trust by the plaintiff, the court finds from a reading of the trust instrument that the plaintiff retains the control of the disposition of the assets, including the right to remove assets from the trust at her sole discretion. cf. Plaintiff's Exhibit 8, The Lisbeth S. Levine Trust Agreement. For marital dissolution purposes, the court considers the assets of this trust to be part of the plaintiff's estate. CT Page 5707
The plaintiff's assets came from several sources. When she was widowed in 1943, she received life insurance and proceeds from the sale of the marital home totaling approximately thirty-two thousand ($32,000) dollars. She turned these funds over to her father to be invested in the family business. From this investment, the plaintiff received passive income during the marriage as well as a balloon payment of an undetermined amount.
The plaintiff also testified credibly that she received an inheritance of 25% of her father's estate. An inventory of this estate, dated May, 1970, valued it at two hundred sixty-seven thousand, eight hundred seventy ($267,870) dollars. Thus, from the plaintiff's testimony and the inventory valuation, the court finds that she inherited between sixty-five and seventy thousand ($65,000-70,000) dollars from her father. Also, as to the source of the plaintiff's funds, the plaintiff owned two pieces of property with her brother Albert prior to the marriage. Shortly after the marriage these properties were sold. From this transaction, the plaintiff received the sum of approximately seventy thousand ($70,000) dollars. Finally, for the past several years, the plaintiff has received Social Security income which she was able to save until the parties' separation.
As a result of the plaintiff's wise investment decisions, and favorable general economic conditions the funds she received have reached the aggregate value of approximately six hundred eighteen thousand ($618,000) dollars. The defendant made no direct or indirect contribution to the acquisition, preservation, or appreciation of these assets.
The defendant claims, however, that the plaintiff was able to accumulate these assets because he supported the household. While there is merit to the defendant's assertion that he provided more funds for the household than did the plaintiff, the court finds that both parties contributed to the household in varying amounts and in different ways. Though the defendant contributed more dollars to meet household expenses, the plaintiff remained at home and provided homemaker services which enabled the defendant to pursue his career without having to concern himself with attention to the mundane chores of housecleaning, cooking, etc.
In addition to their separate investments, the parties made contributions to the children of their prior marriages from their separate estates without consultation or disclosure. Indeed, a review of the financial picture painted during this marriage of CT Page 5708 nearly forty-two years reveals a history of total financial separateness bordering on secrecy from one another, except for the shared payment of household expenses.
The Golf Road residence is presently valued at approximately two hundred and eighty-five thousand ($285,000) dollars. There is no mortgage. Though the defendant acknowledges that this property has always been in the plaintiff's name alone, he claims that his payments toward household maintenance over the years contributed to his present value. The court is unpersuaded. During the time the defendant was paying a share of the home expenses, he also enjoyed the use and occupancy of the residence. The defendant's payment of the monthly mortgage in the amount of one hundred sixty five ($165) dollars and additional household expenses can be viewed, in a practical sense, as little more than reasonable payment for his use and occupancy of the plaintiff's home. The increase in value of this home from approximately forty-eight thousand ($48,000) dollars at the time of the marriage to its present value is due, in large part, to the luck of an upwardly mobile real estate market. Under the circumstances of this case, the defendant's contributions toward household expenses entitle him to no interest in the plaintiff's home, nor to any payment based on its appreciation in value during the years of the marriage.
In determining what, if any, disposition to make of the parties' assets, the court has carefully reviewed the criteria set forth in Connecticut General Statute 46b-81. From this review and in light of the evidence adduced at the hearing, the court concludes that no award of property should be made to or from either party. At the outset of their marriage, the parties determined to keep their assets separate from one another. In handling their assets, they acted as strangers to one another. They neither sought nor received advice from one another. Not only did they not consult together, but they did not share information with each other regarding finances outside the home. Illustrative of this point is the fact that the defendant kept his financial papers in a locked cabinet in the home. The plaintiff had no key to this cabinet. It's contents were not available to her. Additionally, the defendant maintained two safety deposit boxes to which the plaintiff had no access. One of these contained his Last Will and Testament.
The parties have been separated since February, 1997 when the defendant was admitted to the hospital. The defendant suffered a CT Page 5709 stroke in 1993 from which he became partially incapacitated. He lost some fine motor coordination, which resulted is his needing periodic help in eating, bathing, toilet care, and dressing. From 1993 to 1997, the plaintiff tended to the defendant's physical needs at the Golf Road residence, but during this time the defendant's health worsened, and his need for care increased beyond the plaintiff's capacity. In January, 1997, the defendant had surgery after which his condition worsened. When the defendant fell in February, 1997, the plaintiff took him to the hospital for examination. At this time she told the defendants' children that she needed a break from her caretaking responsibilities for a few weeks. When an argument ensued, the plaintiff made arrangements for the defendant to be taken to the Hebrew Home where he has since been a resident. She has not seen the defendant since this unhappy occurrence.
While a history of tensions between the plaintiff and the defendant's adult children was made evident at trial, the relationship between the plaintiff and the defendant's children is not relevant to the court's consideration of the claims it now confronts.[1]
It is clear from the plaintiff's testimony, and from the testimony of her son, Bernard Kamerman, that for many years of the marriage, the parties had no real relationship. In the earlier years of the marriage, while Mr. Kamerman was frequently in the home, he noted that the parties frequently and bitterly fought. Later, when Mr. Kamerman visited over the years, he noted the parties' distance from one another, and he sensed a continuing current of tension in the household. His testimony is consistent with his mother's unhappy conclusions about the marriage. From the evidence adduced at trial, the court finds that the marital relationship between the parties had been strained for years prior to their ultimate separation. As a loving relationship, it has long since ended. As a genuine partnership, it appears to have never existed. The marriage is broken down irretrievably. Judgment may enter dissolving it on that basis.
The defendant seeks alimony. From the defendant's 1997 tax return, the court concludes that he has available to him the annual gross sum of approximately thirty-eight thousand ($38,000) dollars from Social Security and passive income. His weekly expenses at the Hebrew Home are approximately fifteen hundred and seventy-five ($1575) dollars. Thus, the cost of his care at the CT Page 5710 Hebrew Home eclipses his annual income by approximately forty-four thousand ($44,000) dollars.[2] In addition, the defendant's daughter, Elizabeth Levine, testified credibly that the defendant appears to benefit significantly from the services of a health aide. This aide presently assists the defendant for three hours a week, at an hourly rate of twelve dollars and fifty ($12.50) cents. Ms. Levine testified that when the aide is present her father's spirits are lifted. He seems more comfortable and alert after the aide has been with him.
The plaintiff has annual income of approximately forty-six thousand, four hundred ($46,400) dollars derived from Social Security payments and passive income. While her financial affidavit suggests that her weekly expenses are substantially greater than her income, the court notes that some of her expenses, e.g. travel and entertainment, gifts/children, grounds/snow removal, miscellaneous, are discretionary.
In assessing the defendant's claim for alimony, the court has carefully reviewed the statutory criteria set forth in C.G.S.46b-82. In this case, the court believes the plaintiff has some responsibility help pay for the defendant's ongoing medical care needs. The amount determined by the court is inadequate to meet the defendant's weekly deficit without his having to invade the principal of his assets, and a greater weekly sum than the plaintiff has available to her without needing to invade the principal of her assets or attaining a more favorable return on her liquid assets. In determining the amount, the court has taken into consideration not only the parties' stated disposable incomes and respective expenses, but the court has considered the extent and liquidity of their estates as well. In framing this alimony order, the court has also considered the absence of any award of property from the plaintiff to the defendant. Accordingly, the plaintiff is ordered to pay the sum of four hundred ($400) dollars a week to the defendant as periodic alimony. This order shall terminate upon the death of either party and shall not be subject to modification by either party or by any person whose rights are derived from either party.
The court has reviewed the defendant's request for counsel fees in light of the statutory criteria set forth in C.G.S.46b-62. Each party is capable of paying his and her own counsel fees. No award of counsel fees is made.
Judgment may enter accordingly. CT Page 5711
Bishop, J.